UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO.  17-54-DLB-CJS

UNITED STATES OF AMERICA                                                      PLAINTIFF

v.                              **REPORT AND RECOMMENDATION**

TRONTEZ MAHAFFEY
TYRA NELSON                                                                   DEFENDANTS

* * * * * * * * * *

Defendants Trontez Mahaffey and Tyra Nelson have filed Motions to Suppress all evidence seized from their luggage at the Cincinnati/Northern Kentucky International Airport ("CVG") on September 8, 2017.  (R. 38; R. 40).  Defendants allege that the officers lacked either probable cause or reasonable suspicion with respect to their initial detention in the CVG parking garage, and that the officers lacked probable cause for Defendants' subsequent detention and transportation to the airport police station.  (R. 38, at 2-3; R. 54, at 1-2).[1]

An evidentiary hearing on the suppression motions was held on August 3, 2018.  (*See* R. 46).  Defendants each filed a supplemental brief following the evidentiary hearing (R. 54; R. 55) to which the United States filed a response.  (R. 56).  Accordingly, the Motions are now ripe for consideration and the undersigned's preparation of a Report and Recommendation pursuant to 28

---

[1] Defendant Nelson filed the initial Motion to Suppress which Mahaffey joined, and each Defendant filed separate supplemental briefs following the evidentiary hearing.  The Court will analyze Defendants' Motions simultaneously, distinguishing between the Defendants where appropriate.

U.S.C. § 636(b)(1)(B).[2]  For the reasons set forth herein, it will be recommended that Defendants'

Motions to Suppress (R. 38; R. 40) be denied.

## I.    FACTUAL FINDINGS

At the evidentiary hearing, three witnesses testified on behalf of the United States: DEA

Task Force Agent Eli Sautter, Detective Ken Coyle, and K-9 Detective Rob Minter, all employed

with the CVG Airport Police Department.  (R. 49, at 5, 64, 84).  Prior to Defendants' encounter

with the airport police on September 8, 2017, three sets of abandoned suitcases were found in the

short-term parking garage at CVG, which spurred an investigation into Frontier Flight 1870 from

Phoenix, Arizona for potential narcotics trafficking.  (*Id.* at 13, 35, 74, 90).  In the afternoon of

July 27, 2017, officers first discovered two abandoned suitcases in the short-term parking garage

in row A36.  (*Id.* at 6).  A narcotics canine, Faith, was deployed and "alerted" on the suitcases,

indicating the presence of narcotics.  (*Id.* at 6-7; 89-90).  However, the bags were opened and

found to be empty.  (*Id.* at 26).  Officers were able to determine by review of CCTV footage that

the bags had been left in the garage on the previous day.  (*Id.* at 7).  Later in the evening on the

same day—July 27, 2017—officers discovered a second set of two abandoned suitcases in the

short-term parking garage in the "same area."  (*Id.* at 7).  The narcotics canine, Faith, was again

deployed and alerted on the suitcases, indicating the presence of narcotics.  (*Id.* at 7, 27, 89-90).

As with the first set of suitcases, officers opened the second set and found both suitcases to be

empty.  (*Id.* at 27).

Officers found a third set of abandoned suitcases in the short-term garage in row A35 on

August 24, 2017.  (*Id.* at 9).  The officers did not use a canine to test this set of luggage, as the

canine was not available that day.  (*Id.* at 30).  Again, officers opened the bags and found them to

---

[2] See *United States v. Quinney*, 238 F. App'x 150 (6th Cir. 2007) (citing *United States v. Curtis*, 237 F.3d 598, 603 (6th Cir. 2001) (characterizing a motion to suppress as dispositive)).

be empty.  However, Officer Coyle testified that he could smell the scent of marijuana emanating from the third set of bags.  (*Id.* at 77).  None of the witnesses testified as to whether further testing was done on the bags that would indicate whether they ever contained narcotics.  With respect to the third set of suitcases, officers were able to use CCTV footage to determine that the luggage was abandoned by Timaya Smith, Raniza Anderson Irby, and Ashley Drake after arriving at CVG on Frontier Flight 1870 from Phoenix, Arizona.  (*Id.* at 10, 17, 72-73).  Officers observed Smith, Irby, and Drake initially enter CVG on August 22, 2017 with all three proceeding to Gate A7 for a flight to Chicago.  (*Id.* at 17, 72-73).  Officer Sautter testified he believed the flight to Chicago was a connecting flight to Phoenix, although no footage from Phoenix was requested.  (*Id.* at 33).  Officer Sautter also testified the three individuals did not walk together, but rather, "attempted to separate themselves when walking through the Baggage Claim area."  (*Id.* at 17).

The CCTV footage shows the three women arriving back at CVG on August 24, 2017.  (*Id.* at 11-13).  Timaya Smith and Raniza Irby are pictured retrieving luggage from baggage claim matching the luggage that was later found abandoned in the parking garage (one purple iFLY roller suitcase and one black Protégé roller suitcase).  (*Id.* at 12, 69-70).  The third individual, Ashley Drake, appears in the video footage to be walking near Timaya Smith and Raniza Irby through the airport and into the short-term parking garage near where officers later found the abandoned luggage.  (*Id.* at 13-14).  The women appear to be walking together at times, and at other times, separated.  (Exhs. B-4 to B-12; R. 49, at 67-68).  Officer Sautter testified Ashley Drake may have been acting as a lookout for the other two women.  (R. 49, at 13).  After all three women entered the short-term garage, a red Chevrolet car can be seen exiting the garage.  (*Id.* at 14-15).  Video of the car as it stopped at the ticket booth shows a partial image of the driver, who Officers Sautter and Coyle testified appears to be an individual wearing a grey sweatshirt matching that of Ashley

Drake as seen earlier in the footage. (*Id.* at 14-16, 71). The images taken from the CCTV footage show only the forearm and hands of the driver. However, Officers Sautter and Coyle testified the video presents a clearer image. (*Id.* at 16, 71; Exhs. B14-1, B14-2). Upon subsequently running the license plate of the red car seen departing the garage, officers discovered the car was registered to Ashley Drake's mother. (R. 49, at 16). Next, Irby and Ranzina are seen exiting the garage without the luggage, retrieving their personal items from inside the airport, and departing in separate cars at the passenger pickup area. (*Id.* at 16-17).

At this point, the airport police began investigating Frontier Flight 1870 from Phoenix, Arizona, targeting "brand new bags" identified by the wheels showing little wear and the bags having the price tag or plastic ring that holds a price tag still attached to the bag. (*Id.* at 34, 75, 90). Detective Coyle testified Phoenix is considered a "source city" of narcotics for the Cincinnati area. (*Id.* at 78). However, on cross examination, he answered affirmatively when asked "whether it would be easier to say what cities are not source cities" and stated that source cities include multiple cities in California and Arizona, as well as "[a]nything [ ] that borders Mexico" and "anywhere [ ] you have a harbor." (*Id.*). Officer Sautter described the first set of suitcases found on July 27 as "newer," however none of the witnesses specified the brand or color of the bags. (*Id.* at 25). The second set of bags found later in the day on July 27 consisted of a black Protégé roller suitcase and a Coleman roller suitcase of an unspecified color.[3] (*Id.* at 7). Officer Sautter testified some of the bags appeared to be the same brand of bags as the first set. (*Id.*). He further testified "I believe some of them still had the tags remaining of where they just were purchased at the store." (*Id.*). As previously stated, the third set, recovered on August 24, were a black Protégé roller suitcase and a purple iFLY suitcase. (*Id.* at 12). The Protégé suitcase still had the price tag on it

___

[3] The United States specifies in its briefing that the Coleman suitcase was blue. (R. 41, at 2; 56, at 2).

and both bags appeared to be new. (*Id.*). In sum, officers found abandoned in the short-term garage, two unspecified "newer" bags, two black Protégé roller suitcases, one Coleman suitcase of an unspecified color, and one purple iFLY roller suitcase. They "all appeared to be brand-new bags with some even still having the tags [ ] attached." (*Id.* at 18).

On September 8, 2017, the day the two Defendants in the present case, Trontez Mahaffey and Tyra Nelson, were apprehended, the airport police officers were monitoring Flight 1870 from Phoenix. (*Id.* at 19). Officer Minter, and a fourth officer who did not testify at the evidentiary hearing, Lieutenant Kopp, were located "plane-side" where they identified three bags they believed "matched the description of the brand-new bags as the previous abandoned bags." (*Id.* at 18). They appeared "brand new," having either a price tag or plastic ring of a price tag attached and little to no signs of wear on the wheels. (*Id.* at 18, 91). The first two suitcases pulled were Protégé rollers, which had Tyra Nelson's name on the bag tags. (*Id.* at 18-19). The third suitcase pulled was either a Protégé or Coleman, which had Trontez Mahaffey's name on the bag tag. (*Id.* at 19). One of the Protégé bags with Nelson's name on the bag tag still had a price tag attached. (*Id.* at 18).

After the bags were initially identified, they were loaded onto carts and taken into a bag sorting room in Concourse A. (*Id.* at 91). Officer Minter and Lieutenant Kopp pulled the three previously identified bags, as well as three other random bags. (*Id.* at 92). All six bags were separated from each other within the room, and the officers deployed narcotics canine Faith on the bags. (*Id.*). Faith alerted, signaling the presence of narcotics, on the three identified bags, but not on the three random bags. (*Id.*). The officers then placed the three identified bags on the conveyor belt that feeds into baggage claim, putting a plastic tub on either side of the bags to indicate to Officer Sautter and other officers who were located in the separate baggage claim area which bags

5

the dog alerted on.  (*Id.*).  Officer Minter testified he would have made a phone call at that point to inform the officers in baggage claim about the positive alert and the description of the bags.  (*Id.* at 41, 104).

Officer Sautter, positioned in baggage claim, observed Tyra Nelson and Trontez Mahaffey retrieve the three identified bags.  (*Id.* at 20).  Mahaffey also retrieved a fourth bag that the officers had not previously identified, but which matched the description of the other bags.  (*Id.*).  Officer Sautter observed Mahaffey read the name tags on his bags when he pulled them off the conveyor belt.  (*Id.*).  At this point, Officer Minter and Lieutenant Kopp had read the name tags on the bags, but the officers positioned in baggage claim, including Officer Sautter, did not know the identity of either Nelson or Mahaffey.  (*Id.* at 43).

After Mahaffey and Nelson retrieved the luggage, they proceeded to the short-term parking garage, walking down row A34-35, the same area the previously abandoned bags were found.  (*Id.* at 20).  At least four officers—Officer Minter, Officer Sautter, Lieutenant Kopp, and Officer Moyer—followed Defendants from baggage claim into the short-term garage, keeping at a distance.  (*Id.* at 43, 105).  Defendants stopped at a white Chevrolet car that was backed into a parking space and walked towards the rear of the vehicle with the luggage.  (*Id.* at 21, 49, 94).  When the Defendants stopped at the car, the officers also paused more than a courtroom's length away, observing Defendants walk to the back of the car.  (*Id.* at 47, 51, 107).  The officers could not see what Defendants were doing at the back of the car.  (*Id.* at 51, 106).  When Defendants began walking out from the back of the car without the bags, the officers approached.  (*Id.* at 48, 51).

Officer Sautter testified that as he approached the Defendants, he said, "Hello, I'm TFO Sautter from the DEA.  Can I speak to you for a minute?"  (*Id.* at 51).  He further testified that

6

Mahaffey "appeared like he was going to run" and that is when the other officers began shouting orders. (*Id.* at 49-50, 52).   K-9 Officer Minter testified he could not see Defendants behind the car, but when the officers started identifying themselves as police officers, Mr. Mahaffey came out in front of the car and "looked like he was about to run in some direction or something like that." (*Id.* at 106-107, 110).  Officer Minter further testified that the officers were "shouting orders as we were coming up, identifying ourselves and shouting orders" and that he was "running and [ ] shouting out [ ] Police" with "our badge out and everything."  (*Id.* at 107).  The orders Officer Minter shouted were "show me your hands" and "get on the ground."  (*Id.* at 108).  Both Defendants complied with the orders and lay face-down on the ground.  (*Id.* at 52, 108).  Officer Minter testified that after ordering Defendants to the ground, the officers "detained" and identified Mahaffey, asking some basic questions and "shortly thereafter called a transport unit."  (*Id.* at 94, 108).  Officer Minter testified that he may have asked the basic identification questions while Mahaffey was still on the ground.  (*Id.* at 108).  Officer Sautter testified that Nelson remained on the ground for approximately ten to fifteen seconds and then she was "removed [ ] after laying on the ground" and asked about the luggage.  (*Id.* at 53-54).  Nelson verbally consented to a search of her luggage, and Mahaffey denied consent.  (*Id.* at 21, 54).  When asked during cross-examination if Nelson "was free to leave" when ordered to the ground, Officer Sautter testified that she was not free to leave.  (*Id.* at 54-55).

After the officers ordered Defendants to the ground, the officers saw the luggage near the rear of the car.  (*Id.* at 21).  The bag tags had been removed and were laying on the back of the car. (*Id.*).  Officers matched two of the bag tags to the stickers that remained on two of the suitcases. *Id.* at 21).  However, officers were not able to find tags with Mahaffey's name, and the stickers had been removed from the other two pieces of luggage.  (*Id.* at 22).  Before Defendants were

removed to the Airport Police Station, officers ran the license plate of the car and found it to be registered to Ashley Drake. (*Id.* at 21).

Defendants were then transported to the Airport Police Station where they were read their Miranda rights. (*Id.* at 22). The United States concedes that when Defendants were removed to the Airport Police station, they were taken under arrest. (*Id.* at 7). Nelson signed a consent form granting permission to search her two Protégé bags which contained 43 pounds of marijuana. (*Id.* at 22). Mahaffey refused consent to search his suitcases. (*Id.*). Officers obtained a warrant to search Mahaffey's two suitcases and found four pounds of methamphetamine and 37 pounds of marijuana. (*Id.* at 23). On December 14, 2017, a federal grand jury returned an Indictment against Defendants Nelson and Mahaffey for conspiracy to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance (Count 1), aiding and abetting each other to knowingly and intentionally possessing with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance (Count 2), and aiding and abetting each other to knowingly and intentionally possessing with intent to distribute a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance (Count 3). (R. 1).

## II.    ANALYSIS

Defendants assert that officers lacked probable cause with respect to the initial encounter in the parking garage which they claim amounted to an arrest or unlawful seizure. (R. 38, at 2-3). Alternatively, Defendants argue the interaction in the parking garage was a *Terry* stop, and that officers lacked reasonable suspicion for the stop. (R. 54, at 1-2). Lastly, Defendants argue the

subsequent warrantless arrest of Defendants when they were transported to the Airport Police Station was not supported by probable cause. (R. 38, at 3; R. 5, at 2).

As explained below, the officers had reasonable suspicion to temporarily detain Defendants in the parking garage and the officers had probable cause to arrest the Defendants when they were transported to the Airport Police Station. Therefore, it will be recommended that Defendants' Motions to Suppress be **denied**.

A.    **The initial interaction between the officers and Defendants constituted a seizure under the Fourth Amendment.**

The Fourth Amendment provides, "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. Warrantless arrests are permissible "where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *accord Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988).

A threshold question is whether Defendants' initial interaction with the Airport Police in the parking garage constituted a "seizure" within the meaning of the Fourth Amendment. A seizure occurs when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendelhall*, 446 U.S. 544, 554 (1980). Absent physical force, a seizure requires both a "show of authority" and a defendant's yield to that authority. *California v. Hodari D.*, 499 U.S. 621, 628-29 (1991); *United States v. Johnson*, 620 F.3d 685, 691 (6th Cir. 2010) (finding defendant was seized when he stopped walking after police ordered him to "stop" and "stay right there where he was").

In the present case, officers ordered Defendants to "show me your hands" and "get on the ground," and Defendants complied by laying on the ground. (R. 49, at 52, 108). Furthermore,

Officer Sautter testified that in his opinion, Nelson was not free to leave when ordered to the ground. (*Id.* at 54-55). Thus, Defendants were seized the moment they complied with the officers' orders and got on the ground in the parking garage.

**B.    The initial seizure in the parking garage was a *Terry* stop.**

A second threshold question is whether Defendants' initial seizure in the parking garage constituted a *Terry* stop or exceeded the proper scope of a *Terry* stop, amounting to something closer to an arrest. Defendants argue that when police ordered them to the ground, and they complied, they were effectively arrested. (R. 38, at 2). Generally, when an individual is seized within the meaning of the Fourth Amendment, the seizure must be supported by probable cause. *Dunaway v. New York*, 442 U.S. 200, 208-09 (1979). However, *Terry v. Ohio,* 392 U.S. 1 (1968), and its progeny established an exception to this general rule for temporary investigative seizures, for which officers need only a "reasonable and articulable suspicion that the person [was] engaged in criminal activity." *United States v. Knox*, 839 F.2d 285, 289 (6th Cir. 1988), *cert. denied*, 490 U.S. 1019 (1989) (quoting *Reid v. Georgia*, 448 U.S. 438 (1980)). But "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). A temporary investigative detention does not give officers permission to "verify their suspicions by means that approach the conditions of arrest." *Id.* at 499. Furthermore, an investigative detention "must be temporary and last no longer than necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500. The government bears the burden of demonstrating the stop was appropriately limited. *Id.*

During a *Terry* stop, officers "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's

suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984). Whether an officer exceeded the scope of a *Terry* stop is decided on a case-by-case basis, with the court considering "the scope and nature of the restraints placed on an individual's liberty." *United States v. Richardson*, 949 F.2d 851, 856 (6th Cir. 1991) (citing *United States v. Place*, 462 U.S. 696, 705-08 (1983)). The overarching inquiry is "whether the investigators' conduct in detaining the defendants and in pursuing a means of investigation that was likely to confirm or dispel their suspicions quickly was reasonable under the circumstances." *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) (citing *United States v. Sharpe*, 470 U.S. 675, 683, 686 (1985)). Factors courts may consider include whether the defendant was transferred to another location, whether the defendant was physically confined, and whether weapons or bodily force were used. *Id.* at 857. In *Knox*, the Sixth Circuit held, "[t]he test is an objective one: would a reasonable person in the defendant's position have felt that he was under arrest or was otherwise deprived of his freedom of action in any significant way." 839 F.2d at 291 (citing *Miranda v. Arizona*, 384 U.S. at 477).

The Sixth Circuit has found that the drawing of weapons, use of handcuffs, and moving a defendant into a police car or to another location, can be considered reasonable conduct within the scope of a *Terry* stop where the conduct was proportional to the officer's need to protect himself or to control the situation in order to effectuate the purpose of the temporary stop. *See, e.g.*, *Houston v. Doe*, 174 F.3d 809, 814 (6th Cir. 1999) ("[W]hen police officers reasonably fear that suspects are armed and dangerous, they may order the suspects out of a car and may draw their weapons when those steps are reasonably necessary for the protection of the officers."); *Feathers v. Aey*, 319 F.3d 843, 851-52 (6th Cir. 2003) (finding physically seizing the defendant was within

the scope of a *Terry* stop where defendant appeared to be trying to flee into his home); *United States v. Dotson*, 49 F.3d 227, 230-31 (6th Cir. 1995) (finding officer's physical seizure of defendant when he attempted to flee did not constitute an arrest). In *United States v. Jacob*, the Sixth Circuit found a *Terry* stop to be appropriately limited where officers drew weapons and handcuffed the defendant, suspected of drug trafficking, placing him in a police car in order to prevent him from fleeing a traffic stop after his car lunged forward. 377 F.3d at 579.

In the present case, Defendants take issue with the officers' conduct or method of conducting the investigatory stop, rather than the duration of the stop. Defendant Nelson states in her Supplemental Brief that she was arrested "when the officers came running with badges flashed and ordered her to the ground face down." (R. 54, at 2). When officers began approaching the Defendants, who had stopped at a white car, they were walking away from the back of the vehicle, towards the front of the vehicle and without the bags. (R. 49, at 21, 53). Furthermore, both Officers Sautter and Minter testified that Defendant Mahaffey appeared like he was going to run. (*Id.* at 52, 110). Officer Minter testified that Mahaffey was five to ten feet in front of the car, approximately in the center of the road. (*Id.* at 110). While the precise duration of the detention is unclear, Officer Sautter testified that Nelson was on the ground for ten to fifteen seconds, and Officer Minter stated the transport vehicle was called "shortly []after" officers asked the Defendants basic questions. (*Id.* at 53, 94). There is no evidence weapons were drawn or handcuffs were used at this stage. After Defendants got on the ground, the officers approached them and asked basic identification questions and questions about the bags. (*Id.* at 52-53, 94). The officers also matched the removed tags resting on the back of the car to Nelson's bags and ran the license plate of the car, finding it was registered to Ashley Drake. (*Id.* at 21, 62).

12

By ordering Defendants to the ground temporarily, the officers took reasonably necessary precaution to control the situation in order to confirm or dispel their suspicion that Defendants were engaged in narcotics trafficking.  It appeared to officers that Mahaffey was prepared to run, and while it was less likely Defendants were armed as compared to some of the defendants in the cases cited above, the officers' conduct was appropriately less severe in the instant case, as there is no evidence they drew weapons or used handcuffs.  In addition, Defendants went out of sight when they walked to the back of the car, and thus, it is reasonable for officers to believe they could have armed themselves.  After Defendants were temporarily ordered to the ground, the officers swiftly gained additional information to assess whether there was probable cause for an arrest, at which point the Defendants were removed to the Airport Police Station.  Therefore, the initial detention of Defendants in the parking garage did not exceed the scope of a *Terry* stop.

**C.    Officers had reasonable suspicion at the time of the initial seizure.**

The next issue is whether there was reasonable suspicion Defendants were engaged in narcotics trafficking when the *Terry* stop was initiated—when officers approached Defendants and ordered them to the ground in the parking garage.  For an officer to initiate a *Terry* stop, there must be "reasonable and articulable suspicion that the person [was] engaged in criminal activity."  *Knox*, 839 F.2d at 289 (citing *Reid v. Georgia*, 488 U.S. 438 (1980)).  In other words, an officer may not rely solely on his "inchoate and unparticularized suspicion or 'hunch,' but [rather on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."  *United States v. Foster*, 376 F.3d 577, 585 (6th Cir. 2004) (citing *Terry*, 392 U.S. at 27).  To determine whether the suspicion rises to the level of "reasonable and articulable," courts consider the totality of the circumstances.  *United States v. Cortez*, 449 U.S. 411, 417 (1981).  There must be both an objective and particularized basis for the suspicion.  The first requirement may be satisfied by

evidence showing a "common pattern of criminal operation" which need only be recognizable to one "versed in the field of law enforcement." *Id.* at 417-18.

In the present case, officers detected a general pattern of behavior indicative of narcotics trafficking, whereby individuals were using new bags to transport drugs on the Frontier flight from Phoenix to CVG then abandoning the bags in row A34-35 of the short-term parking garage. As Officer Sautter testified, "[t]hat's the first time in my 15-year career that I've ever seen bags with information removed and left abandoned in the short-term garage." (R. 49, at 29). Although no drugs were found inside of the first two sets of luggage, the third set smelled of marijuana, and the video footage capturing the suspicious actions of Timaya Smith, Raniza Irby, and Ashley Drake shed light on the first two incidents of abandoned bags, prompting further investigation. Defendants Nelson and Mahaffey followed this pattern of behavior, and at the time officers ordered Defendants to the ground in the parking garage, they were aware of the following facts: (1) Defendants were traveling on the Frontier flight from Phoenix, Arizona (a "source city"), the same flight taken by Timaya Smith, Raniza Irby, and Ashley Drake on August 24, 2017—the day the abandoned bags smelling of marijuana were found, (2) Defendants' luggage was similar in nature to the previously abandoned luggage, (3) a trained narcotics canine positively alerted on Defendants' luggage, (4) Defendants proceeded to row A34-35 in the short-term parking garage where the previously abandoned luggage was found, and (5) as officers approached and identified themselves, Mahaffey looked like he was going to flee. (R. 49, at 10-11, 20, 52, 92-94). Thus, based on the totality of circumstances, officers had reasonable suspicion to engage Defendants in a *Terry* stop.

Defendants challenge the officer's reliance on the fact that Defendants were traveling from a "source city." (R. 54, at 7). The Sixth Circuit has found that traveling to or from a source city

is a "weak indicator" of illegal drug activity, as it applies too broadly to innocent travelers flying to and from major cities in the United States. *United States v. Urrita*, 520 F.3d 569, 676-77 (6th Cir. 2008). However, in the present case, Defendants were not merely traveling from a "source city." Rather, they were traveling on the same Frontier flight from Phoenix, Arizona to CVG that Timaya Smith, Raniza Irby, and Ashley Drake took the day the abandoned bags smelling of marijuana were found. (R. 49, at 10). Thus, it is appropriate for the Court to consider this factor in finding reasonable suspicion.

In addition, Defendants challenge the reliability of the dog, Faith, that alerted on the first two sets of luggage found on July 27, 2017, as well as on the Defendants' luggage after it was identified by officers while being unloaded from the plane. (R. 49, at 89-90, 92). Defendants specifically claim that because Faith positively alerted on the suitcases found on July 27, which did not contain narcotics, these alerts constituted "false positives" and thus call into question Faith's overall reliability. (R. 54, at 6-7). It is well established that "a positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) (citing *United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994)); *see also United States v. Alvarado*, 936 F.2d 573 (table decision), 1991 WL 119265, at *2 (6th Cir. July 1, 1991) (holding "probable cause to arrest defendant existed from the moment he took possession of the luggage on which [the] trained narcotics dog had previously alerted") (citing *Florida v. Royer*, 460 U.S. 481, 505-06 (1983); *United States v. Knox*, 849 F.2d 285, 288 (6th Cir. 1988)). In order for a positive alert to support a finding of probable cause, "the training and credibility of the dog must be established." *Torres-Ramos*, 536 F.3d at 554. "[E]vidence of a dog's satisfactory performance in a certification or training program can in itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568

U.S. 237, 246 (2013). This evidence need not consist of the actual certification records, as testimony by the dog handler or trainer is sufficient. *Torres-Ramos*, 536 F.3d at 554 (citing *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999)). Furthermore, "[f]ield data [ ] may markedly overstate a dog's real false positives . . . . [and] those inaccuracies [ ] do not taint records of a dog's performance in standard training and certification settings." *Harris*, 568 U.S. at 246. Nevertheless, defendants may present evidence challenging the reliability of the dog through cross examination or presenting fact or expert witnesses. *Id.* at 247. Courts should apply the usual totality-of-the-circumstances approach when assessing the reliability of a positive alert by a trained dog, weighing the competing evidence to determine "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

Officer Minter, who has been Faith's handler for the past four years, testified that Faith underwent an initial eight-week training program followed by three weeks of advanced training and an additional three weeks of training specifically with Officer Minter. (R. 49, at 85). Minter also engages in training with Faith at least once a week. (*Id.*). Faith has been specifically trained to identify marijuana, cocaine, heroin, and methamphetamine. (*Id.* at 87). Officer Minter further testified that Faith is currently certified by the North American Police Working Dog Association and that her accuracy rate is approximately 95-98%. (*Id.* at 85, 87; Exh. D). In addition, Minter described the certification process as involving sixteen challenges with the dog only being allowed to miss one of the challenges in order to pass. (R. 49, at 96). Furthermore, when Officer Minter deploys Faith, he usually places random suitcases near the suspected bags for Faith to sniff to increase the reliability of the test. (*Id.* at 87-88). This is what occurred on September 8, 2017, when Faith sniffed the Defendants' bags. (*Id.* at 92-93). Officers pulled three random bags in

addition to the identified three bags marked as belonging to Nelson and Mahaffey. The bags were then separated in the sorting room, and Faith alerted on the Defendants' bags, but not on the randomly pulled bags. (*Id.*). Because no other luggage was available in the parking garage to test the abandoned luggage on July 27, Officer Minter ran Faith along vehicles in the area prior to bringing her to where the suitcases were located. (*Id.* at 89). When questioned about the fact that Faith alerted on the first four abandoned bags, yet no narcotics were found inside, Officer Minter explained that he believes there had been narcotics in the luggage at one point, which were removed prior to being abandoned. (*Id.* at 115). In his opinion, these alerts were not "false positives." (*Id.* at 119). The Officer elaborated that when the dog alerts, and nothing is found in the bag, it may not constitute a "false positive" when viewed in context, such as when the bag sells of marijuana or the owner of the bag confesses to having used controlled substances near the bag. (*Id.* at 115, 118).

Faith did alert on the first two sets of bags, which were empty. However, the bags were found under suspicious circumstances having been abandoned in the garage. That officers later found in the same area of the garage a third set of bags that smelled of marijuana, as well as Defendants' bags which contained narcotics, renders credible Officer Minter's testimony that there may have been drugs in the bags prior to being abandoned. Even if the positive alerts on the first two sets of luggage should properly be considered "false positives," the Sixth Circuit has found that "a very low percentage of false positives is not necessarily fatal to a finding that a drug dog is properly trained and certified." *Diaz*, 25 F.3d at 396; *see also Alvarado,* 1991 WL 119265, at *2 (finding dog reliable with reported 95% accuracy); *United States v. Patton*, 517 F. App'x 400 (6th Cir. 2013) (finding dog reliable with accuracy rating of over 90%).

In addition, as noted above, the Supreme Court has cautioned against placing undue weight on field data pertaining to a dog's accuracy as compared to a dog's record when performing in a controlled environment. *Harris*, 568 U.S. at 246. Officer Minter testified that Faith has an overall accuracy rating of 95-98% and that she receives annual certification by taking a test requiring over 90% accuracy. (R. 49, at 85, 87, 96). Considering these factors together, the Court finds that Faith is sufficiently reliable and well-trained, such that the dog's positive alert on Defendants' luggage supported reasonable suspicion to temporarily detain the Defendants in the parking garage. Furthermore, having established that Faith is a reliable and trained narcotics dog, the positive alert on Defendant's luggage not only supports a finding that the officers had reasonable suspicion to temporarily detain Defendants, but also would support a finding of probable cause to search the luggage and arrest the Defendants. *Torres-Ramos*, 536 F.3d at 554 (citing *Diaz*, 25 F.3d at 393-94); *Alvarado*, 1991 WL 119265, at *2 (citing *Royer*, 460 U.S. at 505-06; *Knox*, 839 F.2d at 288).

In sum, the temporary detention of Defendants in the parking garage was supported by reasonable suspicion, considering the facts and circumstances discussed above. This is especially so in light of the significant weight courts give to positive alerts by well-trained and reliable dogs indicating the presence of narcotics.

### D.    Officers had probable cause to arrest the Defendants.

The final issue is whether officers had probable cause when they detained Defendants and transported them to the Airport Police Station, which the Government concedes amounted to an arrest. (R. 56, at 9). A warrantless arrest is reasonable under the Fourth Amendment "where there is probable cause to believe that a criminal offense has been or is being committed." *United States v. Marrero*, 651 F.3d 453, 468 (6th Cir. 2011) (quoting *Devenpeck*, 543 U.S. at 152). There is no "precise formula" for assessing probable cause. *United States v. Strickland*, 144 F.3d 412, 415

18

(6th Cir. 1998). Instead, "[t]o determine whether an officer had probable cause to arrest an individual, [courts] examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). In other words, "[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." *Marrero*, 651 F.3d at 468 (quoting *Henry v. United States*, 361 U.S. 98 (1959)). Additionally, "[w]hile probable cause means that 'officers must show more than mere suspicion, the probable cause requirement does not require that they possess evidence sufficient to establish a prima facie case at trial, must less evidence sufficient to establish guilt beyond a reasonable doubt.'" *United States v. Romero*, 452 F.3d 610, 616 (6th Cir. 2006) (quoting *Strickland*, 144 F.3d at 416).

To reiterate, the information known to the officers at the time they reached the garage consisted of the following: (1) Defendants were traveling on the Frontier flight from Phoenix, Arizona (a "source city"), the same flight taken by Timaya Smith, Raniza Irby, and Ashley Drake on August 24, 2017—the day the abandoned bags smelling of marijuana were found, (2) Defendants' luggage was similar in nature to the previously abandoned luggage, (3) a trained narcotics canine positively alerted on Defendants' luggage, (4) Defendants proceeded to row A34-35 in the short-term parking garage where the previously abandoned luggage was found, and (5) as officers approached and identified themselves, Mahaffey looked like he was going to flee. (R. 49, at 10-11, 20, 52, 92-94). While officers temporarily detained Defendants in the parking garage, they quickly gained additional information. The officers confirmed the identities of Nelson and Mahaffey and observed the removed tags from Nelson's bags sitting on the rear of the car, matching them to the stickers that remained on her two bags. (*Id.* at 21, 53, 94). Officers also ran

19

the license plate of the white Chevrolet vehicle at which the Defendants stopped, finding it registered to Ashley Drake. (*Id.* at 21). Officers had previously observed Drake on CCTV video drive out of the parking garage in a red Chevrolet sedan on August 24, 2017 after Smith and Irby brought the suitcases into the short-term garage—and then walked out of the garage without them. (*Id.* at 62).

As discussed in the section above, a positive dog alert by a reliable and trained dog, standing alone, establishes probable cause. *Torres-Ramos*, 536 F.3d at 554 (citing *Diaz*, 25 F.3d at 393-94); *Alvarado*, 1991 WL 119265, at *2 (citing *Royer*, 460 U.S. at 505-06; *Knox*, 849 F.2d at 288). Because the Court has already determined the narcotics dog that alerted on the Defendant's luggage was reliable and well-trained, officers had probable cause on this basis alone to search Defendants' luggage and to arrest Defendants following this positive alert. Therefore, the positive alert, considered in conjunction with the other information known to the officers when they transported Defendants to the Airport Police Station, amounted to probable cause that Defendants were engaging in illegal drug activity.

## III.   CONCLUSION AND RECOMMENDATION

The evidence and testimony presented at the evidentiary hearing, as well as the evidence set forth in the record, demonstrate that Defendants' constitutional rights were not violated such that suppression is warranted.

Accordingly, for the reasons stated herein, **IT IS RECOMMENDED** that Defendants' Motions to Suppress (R. 38; R. 40) be **denied.**

Specific objections to this Report and Recommendation must be filed within fourteen (14) days of the date of service or further appeal is waived. 28 U.S.C. § 636(b)(1)(C); Fed. R. Crim. P.

59(b)(2); *Thomas v. Arn*, 728 F.2d 813, 815 (6th Cir. 1984), *aff'd*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Dated this 2nd day of November, 2018.



**Signed By:**

***Candace J. Smith***

**United States Magistrate Judge**

J:\DATA\Orders\criminal cov\2017\17-54-DLB MTSupp R&R.docx